DANIEL R. KRUSE (OSB No. 064023)
dkruse@cldc.org
Attorney at Law
130 South Park Street
Eugene, OR 97401
(541) 870.0605
(541) 484.4996 (Fax)
Lead Counsel

TANYA M. SANERIB (OSB No. 025526)
tanya@crag.org
CHRISTOPHER WINTER (OSB No. 984355)
chris@crag.org
Crag Law Center
917 SW Oak Street, Suite 417
Portland, OR 97205
(503) 525.2722 (Sanerib)
(503) 525.2725 (Winter)
(503) 296.5454 (Fax)

SCOTT JERGER (OSB No. 023377)
scott@fieldjerger.com
Field Jerger LLP
621 SW Morrison Street, Suite 1225
Portland, OR 97205
503-228-9115
503-225-0276 (Fax)

NICHOLAS CADY (OSB No. 113463)
nick@cascwild.org
Cascadia Wildlands
P.O. Box 10455
Eugene, OR 97440
(541) 434.1463

SUSAN JANE M. BROWN (OSB No. 054607)
brown@westernlaw.org
Western Environmental Law Center
4107 NE Couch St.
Portland, OR 97232
(503) 914.1323
(541) 485.2457 (Fax)

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **CASCADIA WILDLANDS, THE CENTER FOR BIOLOGICAL DIVERSITY**, and **AUDUBON SOCIETY OF PORTLAND,**<br><br><div align="center">Plaintiffs,</div><br>v.<br><br>**JOHN KITZHABER**, in his official capacity as Governor of Oregon and Chair of the State Land Board; **TED WHEELER** and **KATE BROWN**, in their official capacity as members of the State Land Board; **DOUG DECKER**, in his official capacity as Oregon State Forester with the Oregon Department of Forestry; **LOUISE SOLLIDAY**, in her official capacity as Director of the Department of State Lands; **JOHN BLACKWELL**, in his official capacity as Chair of the Oregon Board of Forestry; **SYBIL ACKERMAN**, **CINDY DEACON WILLIAMS, NILS CHRISTOFFERSEN, TOM INSKO, GARY SPRINGER,** and **STEVE WILSON**, in their official capacity as Board Members of the Oregon Board of Forestry;  **TOM SAVAGE**, in his official capacity as District Forester for the Astoria District; **JIM YOUNG**, in his official capacity as District Forester for the Coos District; **ANDY WHITE**, in his official capacity as the District Forester for the Forest Grove District; and **DAN GOODY**, in his official capacity as the District Forester for the Tillamook District,<br><br><div align="center">Defendants.</div> | Case No.: 3: _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Endangered Species Act citizen's suit, 16 U.S.C. § 1540(g) |

# INTRODUCTION

1.      Cascadia Wildlands, the Center for Biological Diversity, and the Audubon Society of Portland (hereafter plaintiffs) bring this citizen suit pursuant to section 11(g) of the Endangered Species Act, 16 U.S.C. § 1540(g), to enjoin State-authorized logging activities and forest management decisions that are causing the "take" of threatened marbled murrelets – sea birds that nest near the Oregon coast in mature and old-growth trees with large branches – in violation of section 9 of the Act.  16 U.S.C. § 1538(a)(1)(B).

2.      The threatened population of marbled murrelets has continued to precipitously decline since the population was listed under the Endangered Species Act in 1992.  Despite this fact, in 2009, defendants abandoned their efforts to prepare Habitat Conservation Plans and obtain incidental take permits, 16 U.S.C. § 1539(a)(2), for the "take" of marbled murrelets resulting from the logging and forest management activities authorized by the State, or take other measures sufficient to protect this species as required under federal law.

3.      Instead, defendants are engaging in the unpermitted "take" of marbled murrelets under the Endangered Species Act.  16 U.S.C. § 1538(a)(1)(B), (G).  Defendants are systematically authorizing timber sales on the Tillamook, Clatsop, and Elliott State Forests that log areas occupied by marbled murrelets and fragment interior forest habitat that marbled murrelets need for successful nesting and reproduction.  In approving timber sales, defendants create Marbled Murrelet Management Areas – *i.e.*, purported murrelet reserves that are occupied by marbled murrelets and supposed to be off limits for logging.  Many of these reserves and the associated logging projects fail to provide sufficient habitat to protect the birds or their nesting sites and are contributing to the fragmentation and loss of marbled murrelet habitat.

1

4.     The "take" of marbled murrelets is also resulting from defendants' approval, adoption, and implementation of a "take avoidance policy" that causes unpermitted "take" of marbled murrelets.  This take is due to defendants' failure to obtain an incidental take permit under the Endangered Species Act, 16 U.S.C. § 1539(a)(1)(B), for management of the Tillamook, Clatsop, and Elliott State Forests.

5.     The unpermitted "take" of marbled murrelets is further caused by defendants' approval of forest management plan revisions that increase logging on the Tillamook and Clatsop State Forests and approval of a new forest management plan that increases logging on the Elliott State Forest.  The implementation plans and annual operation plans for these forests result in logging that also causes "take" of marbled murrelets.  By managing the Tillamook, Clatsop, and Elliott State Forests without obtaining an incidental take permit pursuant to section 10 of the Endangered Species Act, 16 U.S.C. § 1539(a)(1)(B), defendants are unlawfully "taking" marbled murrelets.  This take is occurring in numerous ways, including by approving management plans that injure, harm, and harass members of the species, as those terms are defined under the Endangered Species Act.  *Id.* § 1532(19).

6.     As a result of these legal violations, plaintiffs seek a declaratory judgment that defendants are violating the Endangered Species Act by unlawfully taking marbled murrelets by: approving logging of habitat occupied by marbled murrelets; fragmenting occupied and suitable marbled murrelet habitat; creating Marbled Murrelet Management Areas that are insufficient to protect the birds and their habitat and are leading to habitat fragmentation; adopting and applying a "take avoidance" policy that fails to prevent take of marbled murrelets; and establishing logging levels and otherwise authorizing logging on the Tillamook, Clatsop, and Elliott State Forests that will result in take of marbled murrelets.

2

7. Plaintiffs further seek an injunction barring defendants from approving timber sales that "take" marbled murrelet within the meaning of the Endangered Species Act. Plaintiffs also seek an injunction barring defendants from further implementation of the forest management plans for the Northwest forests (Tillamook and Clatsop) and Elliott state forests; the implementation plans for the Astoria, Coos, Forest Grove, and Tillamook districts; and the annual operations plans for these districts except in compliance with an incidental take permit issued under section 10 of the Endangered Species Act. Plaintiffs also seek an award of their attorneys' fees and costs and such other relief that the Court deems appropriate.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction and the authority to grant the relief requested pursuant to section 11(g) of the Endangered Species Act, 16 U.S.C. §§ 1540(c), (g), 28 U.S.C. § 1331 (federal question), and the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.

9. As required by section 11(g)(2)(A)(i) of the Endangered Species Act, plaintiffs provided defendants with notice of the violations embodied within this complaint by letter dated January 19, 2012. 16 U.S.C. § 1540(g)(2)(A)(i). The notice letter is provided as Exhibit 1 to this complaint.

10. Defendants Governor Kitzhaber; State Land Board members Ted Wheeler and Kate Brown; State Forester Doug Decker; Director of the Department of State Lands Louise Solliday; Chair of the Oregon Board of Forestry John Blackwell; Board Members of the Oregon Board of Forestry Sybil Ackerman, Cindy Deacon Williams, Nils Christoffersen, Tom Insko, Gary Springer, and Steve Wilson or their predecessors; Astoria District Forester Tom Savage; and Coos District Forester Jim Young received a copy of the notice letter on January 20, 2012.

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

11.     Defendants Forest Grove District Forester Andy White and Tillamook District Forester Dan Goody received a copy of the notice letter on January 24, 2012.

12.     As required by section 11(g)(2)(A)(i), plaintiffs notified Ken Salazar, Secretary of the Interior and Paul Henson, Oregon State Director of the U.S. Fish and Wildlife Service of their intent to sue defendants by mailing copies of the Notice Letter to those officials on January 19, 2012.  16 U.S.C. § 1540(g)(2)(A)(i).  Secretary Salazar received a copy of the notice letter on January 26, 2012 and Director Henson received a copy of the notice letter on January 23, 2012.

13.     More than sixty days have passed since the Notice Letter was served and the violations complained of in the Notice Letter are continuing or reasonably likely to continue to occur.  The Secretary of the Interior has not commenced an action to impose a penalty pursuant to section 11(a) of the Endangered Species Act, 16 U.S.C. § 1540(a), and the United States has not taken any other action to prevent continued violations of the Act.

14.     This Court has personal jurisdiction over defendants because they are domiciled in, were served with process in, or maintain their principal place of business in Oregon.

15.     Venue in this district is proper under section 11(g)(3)(A) of the Endangered Species Act, 16 U.S.C. § 1540(g)(3)(A), and section 1391 of the federal venue statute, 28 U.S.C. § 1391, because the logging operations causing take of marbled murrelets are occurring in this district, the decisions that are the subject of this case were also made in this district, and defendants reside in this district.

16.     Pursuant to Local Rule 3-2(b), Divisional Venue is proper in the Portland Division because a substantial part of the property that is being logged, *i.e.* the 154,000 acre Clatsop State Forest and the 364,000 acre Tillamook State Forest, are located in Clatsop, Tillamook, Washington, and Columbia Counties within this Division.  As a result, the timber

4

sales in these forests and the resulting harm from these operations are taking place in the Portland Division.

17.     Additionally, a substantial part of the events and omissions giving rise to plaintiffs' claims also take place in this Division.  Many of the decisions regarding management of the Tillamook and Clatsop State Forests are made within this Division.  The District Forester for the Clatsop State Forest is in Astoria and the District Foresters for the Tillamook Forest are in Tillamook and Forest Grove.  The decisions made by the district foresters are in turn leading to take of marbled murrelets within Clatsop, Tillamook, and Washington Counties.

## PARTIES

### Plaintiffs

18.     Plaintiff Cascadia Wildlands is an Oregon non-profit organization based in Eugene, Oregon and with additional offices in Roseburg, Oregon and Cordova, Alaska. Representing over 6,000 members and supporters, Cascadia Wildlands is devoted to the conservation of the Cascadia Bioregion, which extends from northern California to southeastern Alaska.  Cascadia Wildlands works within this bioregion where immediate threats to wild places are highest.  Currently, these places are Oregon and Alaska.

19.     Cascadia Wildlands uses a combination of education, organizing, outreach, litigation, advocacy, and collaboration to defend wild places and promote sustainable, restoration-based forestry.  The organization has long advocated for improved management of state-owned forests and particularly the Elliott State Forest, a decoupling of school and county funding from state forest timber receipts, and alternative methods of managing state forests to generate revenue and preserve diversity, such as through the creation of carbon sinks.

5

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

20.     Cascadia Wildlands' staff regularly present on issues pertaining to the Elliott State Forest in classrooms and at forums and conferences.  The organization leads public hikes to threatened areas on the Elliott State Forest to showcase the incomparable habitat this forest provides and to build a movement to advocate for its protection.  Cascadia Wildlands' goal is to dramatically reform state lands management in Oregon to ensure the protection of imperiled species such as the marbled murrelet, northern spotted owl, and Oregon coastal coho and the recreational and aesthetic benefits that state-owned forest lands provide for Oregon residents and visitors.

21.     Cascadia Wildlands routinely submits comments on proposals for the management of state-owned forests, and testifies on the record when opportunities arise to discuss this management.  Members of Cascadia Wildlands enjoy recreating, hunting, camping, and otherwise enjoying the Elliott State Forest. Halting older rainforest clearcutting on the Elliott has been one of the organization's priority conservation campaigns over the past five years.

22.     Members of Cascadia Wildlands enjoy recreating in and observing, detecting, and attempting to photograph marbled murrelets in the Elliott State Forest and at the coast.  Cascadia Wildlands' members also enjoy spending time in areas of the forest that provide suitable habitat for marbled murrelet breeding and nesting.  In the past, Cascadia Wildlands and marbled murrelet biologists have led murrelet survey trainings on the forest in the attempt to locate the imperiled birds and protect their habitat.

23.     Plaintiff the Center for Biological Diversity is a non-profit organization dedicated to the preservation, protection, and restoration of biodiversity, native species, and ecosystems. The Center is based in Tucson, Arizona with offices in California, Minnesota, New Mexico, Oregon, Washington, and the District of Columbia.

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

24.     The organization has long advocated on behalf of the marbled murrelet and sought to strengthen protections for the bird and its habitat.  The Center, for example, submitted comments to the Fish and Wildlife Service supporting continued protection for the marbled murrelet in response to a 90-day finding on a petition to remove the species from the list of endangered and threatened wildlife.  The Center also submitted comments on a proposed revision of critical habitat and has intervened in two lawsuits by timber industry organizations seeking to remove or weaken protections for the murrelet.

25.     The Center's Portland, Oregon office and Endangered Species Program has long followed and advocated for additional protections for the Tillamook, Clatsop, and Elliott State Forests by attending and testifying at Board of Forestry and State Land Board meetings, advocating for stronger protections for imperiled wildlife on state lands, and participating in litigation to provide greater protections for imperiled species on state forests.

26.     The Center, for example, produced a report entitled "Species of Concern of the Tillamook Rainforest" that is available online.[1]  The Center also petitioned the Fish and Wildlife Service to protect the North Coast population of the Red Tree Vole under the Endangered Species Act because of the vole's sensitivity to logging and dependence on state forest land.  The Center's actions resulted in the vole being recognized as a candidate for protection.  Finally, the Center led litigation against the Fish and Wildlife Service seeking re-initiation of consultation over the Elliott State Forest's now defunct habitat conservation plan based on new information concerning heightened threats to and continuing declines of northern spotted owls.

---

[1]     The report is available to the public here: http://www.biologicaldiversity.org/publications/papers/TillamookReport.pdf (last visited April 23, 2012).

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

27.     The Center has more than 42,000 members, including many who reside in Oregon and enjoy exploring Oregon's state forests and observing, detecting, and attempting to photograph marbled murrelets.

28.     Plaintiff Audubon Society of Portland is a non-profit conservation organization with a mission to promote the enjoyment, understanding and protection of native birds, other wildlife and their habitats.  The organization has long advocated for protections for dwindling marbled murrelet populations in the Pacific Northwest.

29.     In the late 1980s, Audubon Society of Portland commissioned a study by wildlife biologist David B. Marshall, concerning the health and viability of marbled murrelet populations on the West Coast.  Based on the results of this study, in January 1988, Audubon Society of Portland formally petitioned the U.S. Fish and Wildlife Service to list the marbled murrelet under the federal Endangered Species Act.

30.     After initiating these petitions, Audubon Society of Portland continued to advocate for federal and state protection and designation of critical habitat for the species.  In April 1991, Audubon Society of Portland filed suit in Federal District Court in Seattle, in order to compel the Fish and Wildlife Service to discharge its mandatory duty under the Endangered Species Act by listing the marbled murrelet as a threatened species.  The Fish and Wildlife Service ultimately complied with this request in September 1992.  Audubon Society of Portland continued to litigate in order to compel the Fish and Wildlife Service to designate critical habitat for the marbled murrelet. In recent years, Portland Audubon has intervened in two lawsuits attempting to delist the marbled murrelet to ensure the threatened listing remains in place.

31.     Audubon Society of Portland also owns and manages the 216-acre Ten Mile Creek Sanctuary on the Oregon Coast, which provides habitat for marbled murrelets within the Marbled

8

Murrelet Important Bird Area.  Audubon Society of Portland holds annual survey trainings for marbled murrelets and contributes data to inland survey efforts.  The organization also sponsors educational, scientific research activities that involve study of marbled murrelets and other birds and their natural habitat.

32.    Audubon Society of Portland has been involved in science-based advocacy to protect habitat and species on a statewide and local level, including through the development of the Tillamook and Clatsop State Forest Management Plans.  Audubon's work on State Forest related issues over the past five years includes sitting on three different advisory committees that looked at issues including the "greatest permanent value" of state-owned forest lands, Oregon Department of Foresety funding, and a general issue scan with the Board of Forestry.  Audubon has also testified numerous times regarding harvest levels and State Forest Plans.

33.    Audubon Society of Portland currently has approximately 12,000 members, including many who use Oregon's coastal forests for a wide variety of recreational purposes, including wildlife viewing and attempting to view marbled murrelets.

34.    Plaintiffs have standing to bring this case.  Plaintiffs are organizations whose purposes are dedicated to the protection and enjoyment of biological diversity.  Many of Plaintiffs' members are active birders and devote substantial time and effort to observing and photographing marbled murrelets and their habitat in Oregon's coast range and shoreline. Plaintiffs' members also enjoy recreating on public lands including the Tillamook, Clatsop, and Elliott State Forests and aesthetically enjoy these forest areas.  The plaintiff organizations sponsor field trips to state-owned forests in Oregon, sponsor murrelet surveys, or otherwise have members who enjoy observing, detecting, photographing, and looking for marbled murrelets in the Tillamook, Clatsop, and Elliott State Forests.  Plaintiffs also actively work to protect marbled

9

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

murrelets and their habitat and to ensure better management of state-owned lands in Oregon, including the Tillamook, Clatsop, and Elliott State Forests.

35.     Plaintiffs and their members intend to continue all of these activities in the future. Aesthetic, recreational, professional, and other interests of Plaintiffs and their members in detecting, observing, photographing, studying, protecting and otherwise enjoying marbled murrelets and their habitat are impaired by the take of marbled murrelets resulting from defendants' violations of the ESA.  By authorizing logging in and around occupied murrelet habitat, fragmenting suitable and occupied habitat, creating Marbled Murrelet Management Areas that are insufficient to protect marbled murrelets and their nesting sites, adopting and implementing a "no take" policy that leads to take of murrelets, and deciding to increase logging on the Tillamook, Clatsop, and Elliott State Forests, defendants are causing plaintiffs' injuries. The relief sought in this lawsuit redresses the injuries to plaintiffs' interests.

**Defendants**

36.     Defendant Governor Kitzhaber is the chief executive officer of the State of Oregon and a member of the State Land Board.

37.     Defendants Chair of the Oregon Board of Forestry, John Blackwell and Board Members of the Oregon Board of Forestry Sybil Ackerman, Cindy Deacon Williams, Nils Christoffersen, Tom Insko, Gary Springer, and Steve Wilson are responsible for providing the State Forester with the authority and direction to manage state-owned lands.  The Board of Forestry reviews and adopts Forest Management Plans as administrative rules.  The Board is also responsible for adopting rules to protect resource sites that are relied upon by threatened or endangered species.

10

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

38.     Defendant Oregon Department of Forestry State Forester, Doug Decker is responsible for managing state-owned forest lands, including selling forest products from those lands.  The State Forester develops Forest Management Plans, implementation, and operations plans for the state-owned forests and has the authority to designate land for fish and wildlife.  The State Forester is also authorized to modify or change timber sale contracts.

39.     Defendants State Land Board members Ted Wheeler and Kate Brown along with Governor Kitzhaber oversee the management of Department of State Lands' forests.  The State Lands Board in conjunction with the Oregon Board of Forestry determine which Department of State Lands forests are primarily suited for growing timber and other forest products and should be designated as Common School Forest Lands.  Pursuant to an agreement between the State Land Board, the Oregon Department of Forestry, and the Oregon Department of State Lands, certain forests under the State Land Board and Department of State Lands authority are managed by the Oregon Department of Forestry.

40.     Defendant Director of the Department of State Lands Louise Solliday also oversees the management of Department of State Lands forests and assists her Department in carrying out the work of the State Land Board.

41.     Defendants Astoria District Forester Tom Savage, Coos District Forester Jim Young, Forest Grove District Forester Andy White, and Tillamook District Forester Dan Goody are responsible for overseeing the management of State Forests in their districts and approve the annual operations plans and district implementation plans.  They are responsible for ensuring compliance with the Endangered Species Act.  Pursuant to the State's "no take" policy, the District Foresters also approve the design of reserves set aside for marbled murrelets for nesting and breeding called Marbled Murrelet Management Areas.

11

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

42.    Collectively, the parties discussed in paragraphs 36 to 41 above are "defendants."

## STATUTORY AND REGULATORY FRAMEWORK

### The Endangered Species Act

43.    The Endangered Species Act is the most comprehensive legislation for the preservation of threatened and endangered species ever enacted by any nation. Its fundamental purposes are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species . . . ." 16 U.S.C. § 1531(b).

44.    The term "conserve" means "the use of all methods and procedures which are necessary to bring any endangered or threatened species to the point where the measures provided pursuant to this chapter are no longer necessary." 16 U.S.C. § 1532(3).

45.    Before a species receives any protection under the Act, the Fish and Wildlife Service (FWS) must list the species as either "threatened" or "endangered." 16 U.S.C. §§ 1533(a), (c). A "threatened species" is one that is "likely to become an endangered species within the foreseeable future through all or a significant portion of its range." *Id*. § 1532(20). An "endangered species" is one that is "in danger of extinction throughout all or a significant portion of its range." *Id*. § 1532(6).

46.    Under section 9(a)(1)(B) of the Act, it is illegal to engage in any activity that "takes" an endangered species. 16 U.S.C. § 1538(a)(1)(B). Regulations adopted by the FWS under section 4(d) of the Act, *id*. § 1533(d), apply the Endangered Species Act's take prohibition to threatened species, including marbled murrelets. 50 C.F.R. § 17.31 (applying section 17.21 to threatened species); *id*. § 17.21 (making it "unlawful for any person . . . to commit, to attempt to

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

commit, to solicit another to commit or to cause to be committed . . . take"), 57 Fed. Reg. 45328 (Oct. 1, 1992) (listing the marbled murrelet as threatened).

47.    Congress intended the term "take" to be defined in the "broadest possible manner to include every conceivable way" in which a person could harm or kill wildlife.  S. Rep. No. 93-307, 93d Cong., 1st Sess. 1, reprinted in 1973 USCAAN 2989, 2995.  The term "take" is defined in the statute to include "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(18).

48.    The implementing regulations for the Act define "harm" to include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."  50 C.F.R. § 17.3.  The term "harass" is defined to mean "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering."  50 C.F.R. § 17.3.

49.    Persons subject to the prohibition on take include "any officer, employee, agent, department, or instrumentality . . . of any State," or "any State, municipality, or political subdivision of a State . . . ."  16 U.S.C. § 1532(13).

50.    In order to avoid section 9 liability, section 10 of the Endangered Species Act authorizes the FWS to permit taking "incidental to, and not the purpose of, . . . an otherwise lawful activity."  16 U.S.C. § 1539(a)(1)(B).  In order to obtain an incidental take permit, the applicant must also prepare "a conservation plan" called a Habitat Conservation Plan or HCP. *Id.* § 1539(a)(2)(A).  A Habitat Conservation Plan and an incidental take permit can only be approved after opportunity for public comment if the "taking will be incidental," the "applicant

13

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

will, to the maximum extent practicable, minimize and mitigate the impacts of such taking," sufficient funding is available to carry out the plan, and the "taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild." *Id.* § 1539(a)(2)(B).

51.    The citizen suit provision of the Endangered Species Act authorizes lawsuits against "any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of any provision of [the Act] or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)(1).

52.    Where a violation of the section 9 "take" prohibition is alleged, a court must issue an injunction if a plaintiff establishes by a preponderance of the evidence that there is "a reasonably certain threat of imminent harm to a protected species." *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 2000). Because Congress has accorded the protection of endangered species the highest of priorities, courts do not have the discretion to withhold injunctive relief where it is necessary to prevent an imminent and likely violation of the ESA. *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978).

## FACTUAL BACKGROUND

### A.    The Marbled Murrelet.

53.    The marbled murrelet (*Brachyramphus marmoratus*) is a small sea bird and the only tree nesting bird in the alcid (*Alcidea*) family. Marbled murrelets spend most of their time at sea feeding on fish but nest and engage in courtship behaviors and breeding inland in contiguous mature and old-growth forests.

54.    Murrelets do not build nests but rely on large tree branches with natural depressions and moss in which to lay their egg.

14

55.     For this reason, murrelets use tree branches that provide sufficient space to serve as a platform for the seabird to land and nest.  Platforms are fairly wide flat tree limbs or other surfaces that are at least four inches in diameter and over thirty feet high in a living coniferous tree.

56.     Potential or suitable habitat for murrelet nesting and breeding consists of large areas of old-growth or mature forest and younger coniferous forests with platforms in an area with limited edge habitat (*i.e.*, all habitat that is within 295 feet of non-habitat or the forest edge).  Marbled murrelets more commonly select larger stands of contiguous mature to old-growth forest for nesting.  These areas contain sufficient interior habitat (*i.e.*, habitat away from a forest edge) to protect the nest from blow down during windstorms and from predation by other birds.

57.     Murrelets travel up to 80 kilometers from the ocean to suitable breeding and nesting habitat on shore.  During the breeding season, marbled murrelets will cluster offshore near onshore areas that provide mature and old-growth forests for nesting.

58.     Murrelets do not nest in colonies as other seabirds do, but nest solitarily although often in the same area of forest as other murrelets.

59.     The birds do not nest every year.  When marbled murrelet nesting occurs, it takes place between mid-April and September.

60.     The birds have high site fidelity, returning to the same tree or stand to nest.  Marbled murrelets do not usually nest in the same tree as one another, but they will nest in the same stands of trees.  Marbled murrelet feathers are cryptically colored in browns and whites to blend into the forest environment making them difficult to spot while inland.

61.     The female lays one egg and the male and female incubate the egg in twenty-four hour shifts while the other bird feeds in the ocean.  Typically, the male and female switch

15

incubation shifts once a day at dawn or dusk to avoid detection by predators.  The egg is usually incubated for 28 to 30 days and fledging takes 28 days.

62.     Predominately due to the risk of nest predation (*i.e.,* the loss of an egg or chick), marbled murrelets tend to be very secretive when entering and leaving their nest sites making it difficult to detect the birds while nesting.

63.     Marbled murrelets nests are predated upon primarily by corvids (including jays, ravens, and crows).  Research demonstrates that murrelets nests are highly vulnerable to predation near forest edges where corvid species proliferate.  Predation increases in intensity where edges are coupled with human activity, because remnant human garbage can cause local increases in predator species populations.

**B.     Listing of the Marbled Murrelet as Threatened Under the Endangered Species Act Due to the Loss of Old-Growth and Mature Forests.**

64.     In 1992, marbled murrelets in Washington, Oregon, and California were listed as a distinct population segment that is threatened under the Endangered Species Act.

65.     The primary reason marbled murrelets are listed as a threatened species is the loss of older coastal forests that provide marbled murrelet nesting and breeding habitat.  The primary cause of forest loss and resulting marbled murrelet population declines is commercial timber harvest and related wind throw or blow down of trees, fire, and other natural events.  Marbled murrelets are also at risk from gill-net fisheries and offshore oil spills.

66.     In addition to the direct removal of marbled murrelet nesting habitat, logging also fragments marbled murrelet nesting habitat and increases edge effects, which leads to the increased risk of tree blow down in the windy coast range and/or nest predation.

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

67.    Edge effect in a forest environment typically results when part of the forest is logged, burned, or blows down in a wind-storm.  The result is an area of contiguous forest next to an area that is now largely devoid of a forest landscape.  The creation of an edge in the forest habitat has environmental effects.  The area is less protected which means the forest habitat next to the edge is warmer in the summer, more likely to blow down during wind storms in the winter, and is subject to influence from species that exist in disturbed environments (such as jays or blackberry bushes).

68.    Fragmentation of the forest reduces the available habitat for nesting by breaking it into smaller pieces, creating less interior habitat, and isolating the remaining habitat in small patches.  As the Fish and Wildlife Service has recognized, the "ecological consequences of these habitat changes to marbled murrelets can include effects on population viability and size, local or regional extinctions, displacement, fewer nesting attempts, failure to breed, reduced fecundity, reduced nest abundance, lower nest success, increased predation and parasitism rates, crowding in remaining patches, and reductions in adult survival."

69.    When the marbled murrelet was listed in 1992, the Fish and Wildlife Service concluded that marbled murrelets more frequently occur in larger contiguous forest stands of 500 acres or greater.

70.    Locating marbled murrelets inland so their nesting and breeding habitat can be protected is hard to accomplish.  Marbled murrelet nests are extremely difficult to precisely locate so protection is usually dependent on identifying behaviors that are indicative of the nesting area as opposed to identification of the actual nest or nest tree.  For this reason, it is particular important to protect entire mature and old-growth forest stands where the behavior was detected.

17

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

71.     As the Fish and Wildlife Service has recognized, "[i]t is difficult to locate individual nests for a species that may only show activity near its nest one time per day, and may do so under low light conditions.  Therefore, occupied sites or suitable habitat become the most important parameters" for managing and protecting murrelets.

72.     The Pacific Seabird Group Inland Survey Protocol is the generally accepted procedure for identifying occupied sites and areas used by murrelets onshore.

73.     Despite being listed as threatened under the Endangered Species Act, marbled murrelet populations in Oregon, Washington, and California continue to decline.

**C.     Suitable Marbled Murrelet Habitat in Oregon and State-Owned Coastal Temperate Rainforests:  the Tillamook, Clatsop, and Elliot State Forests.**

74.     In Oregon, marbled murrelets use or have used forest habitat in the following counties for breeding:  Benton, Clatsop, Coos, Curry, Douglas, Josephine, Lane, Lincoln, Polk, Tillamook, Washington, and Yamhill Counties.

75.     On State-owned lands, marbled murrelets predominately rely upon habitat in the Tillamook, Clatsop, and Elliott State Forests for nesting and breeding.

**1.     The Tillamook State Forest**

76.     The Tillamook State Forest is approximately 364,000 acres of forest due west of Portland in Oregon's coast range in Washington and Tillamook counties.  The forest was largely burned in a series of wildfires in the 1930s and 1940s.  Today, the Tillamook provides some of the little remaining mature stands of trees and pockets of old-growth that survived the fires. These areas provide important breeding and nesting habitat for marbled murrelets.

18

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

### 2.    The Clatsop State Forest

77.    The Clatsop State Forest is 154,000 acres of forest in Oregon's coast range, southeast of Astoria in Clatsop, Tillamook, and Columbia counties.  The forest was significantly logged while in private ownership in the early 1900s but retains pockets of old-growth and mature habitat that provide habitat for marbled murrelets.

### 3.    The Elliott State Forest

78.    The Elliott State Forest is approximately 93,000 acres directly south of the Umpqua River near the Pacific Coast in Coos and Douglas counties.

79.    The portions of the Elliott that have not already been logged were mostly burned during severe fire events in the area during the mid-1800s.  Today, these areas are typically mature forest that is between 120 to 140 years old with pockets of remnant patches of forest that are much older.  These stands are excellent habitat for marbled murrelets.

80.    All three state forests provide important marbled murrelet habitat in areas where potential habitat on federal lands exists in small quantities or not at all.

### 4.    Oregon's Management of State-Owned Forests.

81.    State forest lands are managed under a three-tiered management scheme.  The State first develops broad forest management plans, which are meant to guide management for 40 or more years.  These forest management plans are followed by district implementation plans that create the ten-year plan for forest management.  The districts then develop annual operations plans in conjunction with the State Forester and members of the Oregon Board of Forestry.

82.    The Oregon Department of Forestry and the Oregon Board of Forestry have primary authority over management of most of the Tillamook and Clatsop forests, although approximately two percent of the Clatsop is Common School Fund lands, which are managed by

19

the Department of State Lands and the State Lands Board.  Revenue from logging on these

forests primarily supports local counties as well as the Oregon Department of Forestry.

83.     In contrast, the Elliott State Forest is predominately Common School Fund lands

that are owned by the Oregon Department of State Lands and the State Land Board.  These

entities have an agreement with the Oregon Department of Forestry and the Board of Forestry

that allows the latter to plan and authorize logging activities and annual operations plans in the

Elliott State Forest.  Revenue from logging on these lands goes to schools as part of the Common

School Fund.

84.     The Tillamook and Clatsop forests are managed together under the Northwest

Forests Management Plan.

85.     The Elliott State Forest is managed under the Elliott State Forest Management

Plan.

86.     The Tillamook and Clatsop forests are divided into three districts:  the Astoria,

Tillamook, and Forest Grove Districts.

87.     The Elliott State Forest is within the Coos District.

88.     An Implementation Plan and an Annual Operations Plan is prepared for each

district.

**D.     Management of State-Owned Forests and Marbled Murrelet Suitable
        Habitat After the Marbled Murrelet is Listed as Threatened.**

89.     When the murrelet was proposed for listing in 1991, there were believed to be

potentially as few as 1,000 breeding pairs in Oregon.  In commenting on the proposed listing

rule, Oregon's Department of Fish and Wildlife recommended that the marbled murrelet be listed

as endangered in Oregon and California.

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

90.     When the murrelet was listed as threatened in 1992, it was estimated that about 2,000 birds and fewer than 1,000 breeding pairs existed in Oregon.

91.     At the same time, the Fish and Wildlife Service estimated that 82.5 percent of old-growth forests in western Oregon and Washington have been lost to logging when compared to pre-logging forest levels.

92.     After the marbled murrelet was listed, Oregon failed to adopt specific forest practice rules to require surveying or protection of suitable murrelet habitat.

93.     Instead, in 1994 Oregon adopted a Marbled Murrelet Management Plan for state forest lands as a way of attempting to avoid the "take" of marbled murrelets on state-owned lands.  Under the Plan, all potential suitable marbled murrelet habitat within 0.25 miles of a proposed timber sale would be surveyed.  The surveys would be conducted pursuant to a 1993 Inland Survey Protocol developed by the Pacific Seabird Group.  Areas that are occupied by marbled murrelets would be managed as marbled murrelet management areas or MMMAs using 200 acres as a guideline for the appropriate size of these areas.

94.     When defendants first started creating Marbled Murrelet Management Areas, they were on average 165 acres or more.

95.     The Fish and Wildlife Service did not approve Oregon's Marbled Murrelet Management Plan as a way of avoiding "take" of marbled murrelets.

96.     In 1995, Oregon adopted a Habitat Conservation Plan for about 93,000 acres of the Elliott State Forest and received an Incidental Take Permit for take of marbled murrelets and northern spotted owls during forest management activities.

97.     The incidental take permit authorized the incidental take of marbled murrelets for six years (until October, 2001) and the incidental take of northern spotted owls for sixty years in

21

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

exchange for the State establishing a series of forest reserves in predominately old-growth and mature habitat located mostly in the northwestern portion of the Elliott State Forest.

98.     The state failed to adopt Habitat Conservation Plans for the marbled murrelet on other state-owned lands, including the Tillamook and Clatsop State Forests.

99.     In contrast, in 1997, Washington developed forest practice rules to protect murrelets on both state and private forestlands, and Washington's Department of Natural Resources prepared a Habitat Conservation Plan and received an incidental take permit for its management of 1.4 million acres of state-owned lands within the range of the murrelet.  In California, in 1999 the state Redwoods Park developed a marbled murrelet protection management plan.  The California forest practice rules regulating logging of private lands contain a provision requiring review of timber harvest plans that would take or jeopardize federally listed species and the imposition of recommendation measures for protecting the species.

100.     During this timeframe, Oregon began work on a draft Habitat Conservation Plan for the "Western Oregon State Forests," which included all western state forest lands except for the Elliott State Forest.  The initial draft Plan contained provisions for marbled murrelets, northern spotted owls, and strategies for preserving aquatic habitat important for salmon species and terrestrial habitat.

101.     In 1998, Oregon published a draft of this Habitat Conservation Plan for public review.  The draft Plan contained short and long-term strategies for preserving the relatively small amount of occupied or potentially occupied marbled murrelet habitat in these forests.  The short-term strategy for murrelets was to maintain all nesting habitat estimated to be roughly 4,519 acres and to protect 5,551 acres of buffer habitat around the nesting habitat in which only

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

limited forest management activities could occur.  The long term strategy was to maintain these amounts of habitat – *i.e.*, 10,070 acres.

102.     In 2000, when the incidental take permit for marbled murrelets on the Elliott State Forest was near to expiring, Oregon started to draft a new Habitat Conservation Plan for this forest and work on revisions to the Elliott Forest Management Plan to cover marbled murrelets as well as northern spotted owls and Oregon Coast coho salmon.

103.     The North Coast Forests draft Habitat Conservation Plan was also updated to include provisions for coho salmon.

104.     In 2003, the Pacific Sea Bird Group updated its inland survey protocol.  The 2003 protocol is now in use by defendants and other land managers for surveying for occupied murrelet habitat.

105.     Between 2003 and 2006, changes were made to the forest planning documents to begin implementing the draft Habitat Conservation Plan for the Tillamook and Clatsop State Forests.

106.     While working on the draft Habitat Conservation Plans, in 2004, Oregon adopted Marbled Murrelet Operational Policies to attempt to avoid taking marbled murrelets while managing state-owned lands.  These policies superseded Oregon's Marbled Murrelet Management Plan but contained substantially the same process for surveying for murrelets and protecting occupied habitat.  The policies went into effect in 2005.

107.     In 2004, the Fish and Wildlife Service conducted its first five-year review of the status of marbled murrelets in Washington, Oregon, and California.

108.     The 2004 status review found that:  the loss of nesting habitat continues to pose a threat to the population and has not been offset by development of new habitat; there is a positive

23

correlation between the numbers of murrelets found at sea and the availability of larger patches of old-growth habitat inland with low levels of fragmentation and isolation; past logging of old-growth forests has significantly contributed to the decline in marbled murrelet populations; predation is the most significant cause of nest failure; and the murrelet population in Washington, Oregon, and California is not stable through reproduction due to low nest success.

109.    In 2007, the Oregon Board of Forestry asked the Oregon Department of Forestry to develop strategies to protect "species of concern" on the Clatsop and Tillamook State Forests. Some of the "species of concern" are listed under the Endangered Species Act and others are not. Among the species are several amphibians, mammals, fish, and birds, including the marbled murrelet.

110.    In 2008 and 2009, workgroups met to develop strategies for meeting the targets for logging on the state-owned forests lands while putting in place protections for species of concern.

111.    In 2009, the Fish and Wildlife Service prepared a second review of the status of marbled murrelets in Washington, Oregon, and California.

112.    The 2009 status review concluded that the marbled murrelet population declined significantly since 2002 when the Fish and Wildlife Service estimated a population of 24,400 birds to an estimate of about 18,000 birds in 2008 or a 26 percent decline in the population. The FWS concluded that this population decline is "caused by extensive removal of late-successional and old-growth forest which serve as nesting habitat for murrelets." The review noted that nest-site predation and human caused mortality (in the form of fishing impacts, oil spills, and abundance or lack of prey due to overfishing) are also contributing to the declining population or marbled murrelets.

24

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

113.    Specifically on the topic of predation, the five-year review noted that:  "[t]he key elements affecting predation rates appeared to be proximity to humans, abundance of avian predators, and proximity and type of forest edge to the nest.  Based on the latest information, we still find murrelets to be highly vulnerable to nest predation.  New information continues to confirm the importance of nest predation in limiting murrelet nest success."

114.    In 2009, defendants adopted a new ten-year implementation plan for the Tillamook State Forest.  The implementation plan changed the target for "complex structure" on the landscape – *i.e.*, older forest structure – from 50 percent to 40 percent.

115.    References to the draft Habitat Conservation Plan were also removed, and the Tillamook Implementation Plan was revised to ensure management activities are consistent with the State's Marbled Murrelet Operational Policies.

116.    The Tillamook Implementation Plan contemplates between 800 to 3,150 acres of virtual clearcutting also called "regeneration harvest" where all but a few trees in the forest stand are cut per year and between 850 and 3,450 acres of partial cutting per year.  This level of logging equates to 47 million board feet (MMBF) of timber per year.

117.    Despite a tremendous amount of work, the Tillamook and Clatsop HCPs and the revised Elliott HCP were never completed.  In 2009 to 2010, Oregon abandoned its efforts to adopt Habitat Conservation Plans and obtain incidental take permits for the management of the Northwest Forests and for the Elliott State Forest.  At the same time, in California most suitable marbled murrelet habitat is either publicly owned or protected by habitat conservation plans, conservation easements, or other measures, and in Washington the state's forest lands that provide suitable marbled murrelet habitat are predominately managed pursuant to a habitat conservation plan.

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

118.    The primary mechanisms that the State put forward to protect murrelets from illegal take and itself from liability under the Endangered Species Act – *i.e.,* habitat conservation plans – were abandoned in the case of the Elliott or never put into place in the case of the Northwest forests.  Instead, Oregon is implementing a species of concern policy and a "no take policy."

### E.    The Species of Concern Policy.

119.    The Species of Concern Policy applied to the Northwest and Southwest state forests in Oregon.  The Species of Concern Policy is complimentary to the marbled murrelet policies and sets out "anchor habitat" that is supposed to provide short-term protection for key aquatic and terrestrial habitat while logging is increased to meet new State targets.  The Species of Concern Policy replaced the strategies negotiated in the draft Habitat Conservation Plan for the Northwest forests and led to removal of the references to the Habitat Conservation Plan in the forest management plan for these forests.

120.    From 1995 to the present, the size of Marbled Murrelet Management Areas designated on the Tillamook and Clastop State Forests has decreased.  Between 1995 and 1997, the average size of a murrelet reserve was 164 acres.  Between 2006 and 2008, the average size of a murrelet reserve was 124 acres.

121.    Also during this time period, the size of Marbled Murrelet Management Areas designated in the Elliott State Forest decreased.  Between 1992 and 1994, the State created 31 MMMAs on the Elliott State Forest, totaling 5,320 acres and averaging more than 170 acres apiece.  The average size of an MMMA created on the Elliott between 2005 and 2009 was 32 acres.

///

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

F.    **Oregon's "Take Avoidance Policy" for Marbled Murrelets.**

122.    Instead of obtaining incidental take permits, Oregon decided to move solely to what it calls a "take avoidance policy" or "no take" policy on the Tillamook, Clatsop, and Elliott State Forests.  This policy includes three primary documents:  the Marbled Murrelet Operational Policies, the Marbled Murrelet Operational Procedures, and a marbled murrelet guidance document.  The Operational Policies and guidance were updated in 2010 and the Operational Procedures were adopted in 2010.

123.    Pursuant to the "no take" policy, the State first determines whether or not a proposed timber sale will take place in suitable or what the State calls "potential" habitat for marbled murrelet nesting.

124.    The State defines potential habitat to include that habitat within approximately 35-40 miles of the coast that includes mature and old-growth forests, as well as younger forests where platforms exist that can support marbled murrelet breeding.

125.    Typically, defendants hire contractors to perform surveys of potential marbled murrelet habitat.

126.    The surveys take place over two breeding seasons and are supposed to be performed based on the 2003 Inland Survey Protocol developed by the Pacific Seabird Group.

127.    The surveys include establishing several survey stations throughout the proposed timber sale as specified in the Pacific Seabird Group Inland Survey Protocol.

128.    The Inland Survey Protocol expects that each year nine surveys at each survey station, or a minimum of five surveys at each survey station, will be performed.  The surveys are to be scattered during peak murrelet use of inland habitat, which in Oregon is between May 1

27

and August 5.  The surveys within a proposed timber sale area "should be separated by a minimum of 6 and a maximum of 30 days."

129.    Due to the difficulties in detecting marbled murrelets onshore, the surveys are not designed to ensure marble murrelet absence but to identify occupied habitat.

130.    The survey goal is to detect marbled murrelets engaging in certain behaviors that indicate that the forest stand is occupied by murrelets.  These behaviors are called "occupied behavior."

131.    Marbled murrelet behaviors that indicate occupancy include:  perching, landing, or attempting to land on branches; birds flying below, through, into, or out of the forest canopy in a site with potential habitat; or a marbled murrelet calling from a stationary location within the stand.  A site is considered to be occupied if a marbled murrelet engages in any of these behaviors or a nest or the remains of a nest are found, a chick or egg fragments are found on the forest floor, or a bird or a chick are observed in a tree branch.  An occupied site includes nest sites.

132.    The Inland Survey Protocol provides that once subcanopy detections are confirmed the site is classified as occupied and no further surveying is required.

133.    Once an occupied behavior is detected, habitat suitable for successful murrelet nesting is supposed to be preserved through the creation of a Marbled Murrelet Management Area or MMMA ("tri-MA") under Oregon's policies.

134.    Marbled Murrelet Management Areas are supposed to encompass the contiguous forest stand in which the occupied behavior was observed.  The Pacific Seabird Group Inland Survey Protocol defines continuous potential habitat as habitat that contains no gaps in suitable forest cover wider than 100 meters or 328 feet.

28

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

**G.    Defendants' Decisions to Increase Logging on State Forests.**

135.    After deciding to pursue a "no take" strategy, that avoids take in name only, in lieu of obtaining incidental take permits, defendants decided to increase logging on the Tillamook, Clatsop, and Elliott State Forests.

**1.    Increased Logging in the Northwest Forests.**

136.    In 2010, the Board of Forestry adopted revisions to the Northwest Forests Management Plan that governs management of the Tillamook and Clatsop State Forests and the Tillamook, Forest Gove, and Astoria Districts.

137.    The revised Northwest Forests Management Plan lowered the goals for long-term complex structure on the forests from 40-60 percent of the landscape to 30-50 percent and directed the Oregon Department of Forestry to increase revenues (generated by logging) from the forests by five to fifteen percent within the next decade.

138.    The revised management plan also removes references to the planned Habitat Conservation Plan for the Northwest forests and no longer provides for the implementation of the draft Habitat Conservation Plan.  The revised management puts in place the "species of concern" policy.  Pursuant to the Plan and policy, an additional 15 percent of the landscape that would otherwise provide habitat for murrelets and other imperiled species will be lost.

139.    To implement the Northwest Forests Management Plan, the State revised the implementation plans for the Astoria and Forest Grove districts in 2011.  The Astoria Implementation Plan now calls for the annual logging of 73 million board feet of lumber.  The Forest Grove Implementation Plan now calls for the logging of 61 million board feet of lumber a year.

29

140.    Implementation of the revised Northwest Forests Management Plan is expected to increase logging by twenty percent in all the districts.

141.    This increase is evidenced by a comparison between the 2011 Annual Operations Plans for these Districts, and the 2012 and draft 2013 Plans.

142.    The 2011 Annual Operations Plan for the Astoria District called the logging of 60.2 million board feet of timber.  The 2012 Annual Operations Plan and the draft 2013 Annual Operations Plan for the Astoria District call for the logging of 69.7 million board feet of timber.

143.    The 2011 Annual Operations Plan for the Tillamook District calls for the logging of 47 million board feet of timber.  The 2012 Annual Operations Plan for the Tillamook District calls for the logging of 47.3 million board feet of timber.  The draft 2013 Annual Operations Plan for the Tillamook District calls for the logging of 48 million board feet of timber.

144.    The 2011 Annual Operations Plan for the Forest Grove District calls for the logging of 58 million board feet of timber.  The 2012 Annual Operations Plan for the Forest Grove District calls for the logging of 59 million board feet of timber.  The draft 2013 Annual Operations Plan for the Forest Grove District calls for the logging of 59 million board feet of timber.

### 2.        Increased Logging in the Elliott State Forest.

145.    In 2011, Oregon officially backed out of the Elliott Habitat Conservation Plan and incidental take permit and the 60-year commitment to protect forest reserves for listed species. As a result, the large tracts of virtually undisturbed forest in the northwest portion of the Elliott, which until recently served as reserves for threatened and endangered species, are now available for logging under the new forest plan.

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

146.    At the same time, defendants approved a new forest management plan for the Elliott State Forest that significantly increases the amount of logging that will be allowed to occur.    The new forest management plan will increase logging on the Elliott from approximately 25 million board feet to 40 million board feet per year.

147.    The new forest management plan will require areas that were previously set aside as reserves for imperiled species under the Habitat Conservation Plan for the Elliott to be logged.

148.    To implement the management plan, the Coos District recently adopted a new implementation plan.

149.    The 2011 Coos Implementation Plan arranges for the clearcut logging of on average 850 acres a year and commercial thinning of on average 250 acres per year, for an average of 40 million board feet a year during the ten-year time frame of the Plan.

150.    The increase in logging called for by the new plans is evidenced by a comparison between the 2011 and 2012 Annual Operations Plan for the District and the draft 2013 Plans.

151.    The 2011 Annual Operations Plan for the Coos District calls for the logging of 36.5 million board feet of timber.    The 2012 Annual Operations Plan for the Coos District calls for the logging of 24 million board feet of timber.    The draft 2013 Annual Operations Plan for the Coos District implements the new Forest Management Plan and Implementation Plan and calls for the logging of 42 million board feet of timber.

## H.    Tracking the Loss of Suitable Marbled Murrelet Habitat and Population Decline.

152.    A recent scientific study and modeling effort from 2011 documents the amount of suitable marbled murrelet habitat that exists on nonfederal lands in contrast to federal lands.

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

153.    The study uses models to estimate the amount of suitable marbled murrelet habitat that existed in 1996 in Oregon, Washington, and California as compared to running the same models to predict the amount of suitable marbled murrelet habitat that existed ten years later in 2006.

154.    This study concludes that between 1996 and 2006, Oregon lost 4.7 percent of its higher suitablility habitat when gains and losses were taken into account and lost 16.7 percent of higher suitability habitat when only losses were taken into account.  The study defined higher suitability habitat as habitat that received a certain score (above 1.0) based on the mapping and modeling aspects of the study that attempted to predict where mature and old-growth forest is located that can support murrelet nesting and breeding activities.

155.    The study found that the loss of higher suitability habitat "was greatest on nonfederal lands" in Oregon and that this loss of habitat on nonfederal lands was primarily (95 percent) due to logging.

156.    Specifically, the study concluded that between 1996 and 2006, 33.4 percent of the higher suitable habitat in Oregon on nonfederal lands was lost.  By way of comparison, in California 8.1 percent of higher suitable habitat on nonfederal lands was lost and in Washington 30.3 percent was lost.

157.    The reason the loss of habitat is greater on nonfederal lands than federal lands is because federal lands are managed under the Northwest Forest Plan.  Under the Northwest Forest Plan logging is restricted in a system of reserves called Late Successional Reserves or LSRs that are designed to provide protections for terrestrial listed species such as the Northern Spotted Owl and marbled murrelet.

32

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

158.    In Oregon, it is generally assumed that private lands provide very little suitable nesting habitat for marbled murrelets.

159.    Recent scientific papers have also come out that document the decline in marbled murrelet populations over time.  The population decline is rapid.

160.    Population data from 2000 to 2008 show an estimated 2.4 percent annual decline in the murrelet population and data from 2001 to 2008 show an estimated 4.3 percent decline. This equates to a loss of 490 birds per year based on the 2000 to 2008 data or a loss of 870 birds per year based on the 2001 to 2008 data.

**I.    Management of State Forests and the Take of Marbled Murrelets.**

161.    Defendants are causing the take of marbled murrelets through their management of the Tillamook, Clatsop, and Elliott State Forests and authorization of timber sales.

**1.    Take of marbled murrelets from the logging of occupied habitat.**

**a.    Logging of Marbled Murrelet Management Areas.**

162.    Defendants are authorizing the logging of occupied habitat, which causes take of murrelets including by:  a) directly killing and injuring murrelets in occupied stands; b) significantly impairing marbled murrelet essential behavioral patterns, including nesting and breeding; and c) harassing and annoying murrelets to such an extent so as to significantly disrupt their normal behavioral patterns, including feeding, breeding, and sheltering.

163.    Defendants are taking marbled murrelets in this manner by authorizing timber sales in occupied habitat designated as Marbled Murrelet Management Areas.

164.    As one example, defendants authorized logging under the Two Coals and Coal Creek Thinagain sales on the Tillamook State Forest both of which took place in the West Coal Creek MMMA.  The West Coal Creek MMMA was created in January 1995 and amended in

33

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

December 1995 to increase its size from 206 acres to 290 acres. The rationale for the Coal Creek Thinagin sale was to "thin" the unsuitable murrelet habitat around the suitable habitat in the MMMA. This logging was conducted in the late 1990s. In 2005, the Two Coals timber sale was offered and included partial logging along the edges of the MMMA. The result of this collective logging was the blow down of nearly all suitable marbled murrelet habitat in the West Coal Creek MMMA.

165.    Defendants are planning to auction the Moon Creek sale, which will result in logging of the Moonstone MMMA on the Tillamook State Forest; the Sullivan Succotash timber sale, which will result in logging in the Sullivan Headwaters MMMA due to road construction on the Elliott State Forest; and the Flying Fish timber sale, which will result in logging of the Fish Knife MMMA on the Elliott State Forest. All of these sales are in occupied murrelet habitat and are reasonably certain to result in the effects described in paragraph 162.

166.    MMMAs, including the following, have been or will soon be logged as a result of defendants' actions: West Coal Creek MMMA (as part of the Two Coals and Coal Creek Thinagain sales) in the Tillamook State Forest; West Tidewater MMMA (as part of the Rip Tide sale) in the Clatsop State Forest; Music Road MMMA (as part of the Rip Tide sale) in the Clatsop State Forest; West Green Mountain MMMA (as part of the West Green Mountain Combination sale) in the Clatsop State Forest; Simmons Ridge MMMA (as part of the Simmons Ridge sale) in the Clatsop State Forest; the Hansen Falls sale which will result in logging of the Rackheap Creek MMMA on the Tillamook State Forest; and the South Fork Split sale which will result in logging of the West Tidewater MMMA on the Clatsop State Forest; and the Double Fish timber sale which will result in logging of the Knife Forks MMMA on the Elliott State Forest. A

34

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

majority of these areas no longer provide any habitat for marbled murrelets due to the logging, which leads to the blow down of trees, as happened in the West Coal Creek MMMA.

167.    On information and belief, defendants have authorized additional timber sales with similar effects.

### b.    Logging the contiguous stand.

168.    Defendants are also taking marbled murrelets as described in paragraph 162 by authorizing timber sales in contiguous forest stands where occupied behavior has been observed.

169.    To avoid the take of murrelets, when occupied behavior is detected at a survey station, the entire potential habitat in the continuous forest stand where the behavior is documented must be reserved as a Marbled Murrelet Management Area to protect the birds. Again, due to the difficulty associated with detecting murrelets, the surveys do not specifically determine where murrelet nest trees are located.  The surveys indicate that the forest stand is being used by murrelets.  As a result, detection of occupied behavior requires protection of the contiguous forest stand of potential habitat where the detection was made in order to prevent take of murrelets.

170.    Defendants are creating and auctioning timber sale units within the contiguous forest stand of potential habitat where they have documented occupied behavior causing the take of marbled murrelets.

171.    For example, defendants authorized the logging of the Mister Millipede timber sale, which is contiguous with the Trout Mouth Marbled Murrelet Management Area.

172.    Defendants have auctioned the Millicoma Lookout and Comados sales on the Elliot State Forest, and have plans to auction Mister Millipede, Three Buck Joe, Marlow Millicoma Divide, and Sullivan Succotash sales on the Elliott State Forest.  All of these sales

35

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

will result in logging of occupied habitat and thus are reasonably certain to cause take of marbled murrelets as described in paragraph 162.

173.    On information and belief, defendants have authorized additional timber sales with similar effects.

### c.    Logging where occupied behavior is documented.

174.    Defendants are taking marbled murrelets by failing to treat potential habitat as "occupied habitat" even where occupied behavior has been documented in the habitat.

175.    Under the Pacific Sea Bird Group Inland Survey Protocol, potential habitat is considered to be occupied based on a single detection of occupied behavior.

176.    On information and belief, defendants are, after receiving survey results that document occupied behavior in potential habitat, conducting another survey of the stand and based on the new survey are concluding that the potential habitat is not occupied.

177.    Often the new survey is not performed according to the Pacific Sea Bird Group Inland Survey Protocol.

178.    Because the Pacific Sea Bird Group Inland Survey Protocol is not designed to ensure that marbled murrelets are absent from potential habitat, the new survey is leading to the logging of occupied habitat.

179.    For example, the marbled murrelet surveys for the Sullivan Succotash timber sale on the Elliott State Forest detected an occupied behavior in the area delineated as "site one" in 2010 and eleven additional instances of murrelet detections.  Instead of creating a Marbled Murrelet Management Area to protect the occupied murrelet habitat in site one, "verification" surveys were performed.  Subcanopy behaviors were not detected during the "verification" surveys and the habitat was not protected.

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

2.    **Take of marbled murrelets due to the fragmentation of occupied and suitable habitat.**

a.    **Marbled Murrelet Management Areas without sufficient interior forest habitat.**

180.    Defendants are authorizing logging that fragments and reduces occupied and suitable marbled murrelet habitat to the extent that it causes take of marbled murrelets.  This fragmentation and loss of habitat results in take of murrelets including by:  a) death and displacement of birds and reductions in adult survival; b) impairment of essential behavior patterns by reducing nesting attempts, curtailing breeding or causing a failure to breed, lowering nest success, increasing predation and parasitism rates, and crowding birds into remaining patches of habitat; and c) reductions in the murrelet population due to reduced fecundity and nest abundance.

181.    Defendants are taking marbled murrelets in this manner by creating Marbled Murrelet Management Areas (MMMAs) of a size and/or shape that fails to provide the interior forest habitat that marbled murrelets require for nesting and breeding.  This includes significant reductions in the number of acres included in MMMAs and irregularities in the shape of MMMAs that increase edge effects and result in blow down of trees and increased likelihood of predation of murrelet nests.  By creating MMMAs in this manner defendants are fragmenting marbled murrelet habitat and causing take as described in paragraph 180.

182.    For example, the Cougar Mouth Marbled Murrelet Management Area on the Elliott State Forest is shaped like an open-mouthed fish.  This MMMA is only 21 acres in size and provides little if any habitat for marbled murrelets that is not subjected to edge effect.  Likewise, the South Fork Klaskaninie Marbled Murrelet Management Areas on the Clatsop State Forest is a long and thin reserve.  The MMMA is only 13.4 acres and provides little if any

37

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

interior habitat.  Another example is the Footlog Ridge MMMA on the Elliott State Forest that is shaped like an octopus.  This MMMA is only 34 acres in size and provides little interior habitat.

183.    Among the MMMAs created by defendants that are leading to fragmentation of marbled murrelet habitat and take of the birds as described in paragraph 180 are Deer Molar (23 acres), Little Bob (20 acres), South Scholfield  (16 acres), Middle Roberts (16 acres), Millicoma Strawberry (22 acres), Elkhorn Ranch (54 acres), Daggett Headwaters (21 acres), Roberts Headwaters (26 acres), Cougar Mouth (21 acres), Little Sholfield (20 acres), Moonstone (20 acres), Moon Creek (29 acres), South Fork Klaskanine (13.4 acres), California Elk (23 acres), and Hug Point (25.3 acres).

184.    Additionally, as described in paragraphs 120 to 121, defendants have been creating increasingly smaller MMMAs particularly on the Elliott State Forest.

185.    On information and belief, defendants have created other MMMAs of a size or shape that fail to support marbled murrelet nesting behaviors.

**b.    Fragmentation of occupied and suitable habitat.**

186.    Defendants are further causing take in the manner described in paragraph 180 by surrounding occupied habitat, suitable habitat, and MMMAs with timber sales.  By surrounding the limited available habitat for marbled murrelets with clearcuts and thinning projects, defendants are diminishing interior habitat by creating new forest edges and increasing the risk of blow down and nest predation.

187.    For example, defendants authorized the logging of two areas bordering the West Green Mountain MMMA pursuant to the Modified Green timber sale on the Clatsop State Forest.  The sale was auctioned in 2009.  The Modified Green timber sale included clearcut logging to the south of the MMMA and clearing a right of way adjacent to the  west side of the

38

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

MMMA.  The net result is an MMMA that is now bordered on two sides by clearcuts and that no longer provides contiguous forest habitat for marbled murrelets.

188.    Defendants are taking marbled murrelets by auctioning timber sales around MMMAs and in areas that fragment occupied and suitable habitat.  This practice includes sales that are soon to be auctioned:  the Deer Headwaters sale around the Charlotte Headwaters MMMA, the Leaping Larson sale in the Elliott around the Larson Ridge and Larson Bottom MMMAs, and the Three Buck Joe next to the Millicoma Strawberry MMMA.  Defendants have also auctioned the Double Fish timber sale in the Elliott that is adjacent to the Knife Forks MMMA.  In the past defendants have also auctioned the following sales that cause take in this manner:  the Modified Green timber sale in the Clatsop adjacent to the West Green Mountain MMMA; the Helloff Point timber sale in the Tillamook adjacent to the Helloff Creek MMMA; the South Kelly Ridge timber sale in the Elliott adjacent to the Fish Knife MMMA; the West Fork Headlands timber sale in the Elliott adjacent to the West Fork Headlands and Kentucky Ridge MMMAs; the South Marlow Switch timber sale in the Elliott adjacent to the Marlow Bottom MMMA; the Millicoma Lookout sale in the Elliott adjacent to the Millicoma Strawberry MMMA; and the Elkhorn Ranch sale in the Elliott that is adjacent to the Elkhorn Ranch MMMA.

189.    On information and belief defendants have authorized additional timber sales with similar effects.

### 3.    Policies and decisions leading to take of marbled murrelets.

190.    As a result of the practices described in paragraphs 161 to 189, defendants' "no take" policy is causing the take of marbled murrelets.

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

191.    As a result of the practices described in paragraphs 161 to 190, defendants' decisions to increase logging on the Tillamook, Clatsop, and Elliott State Forests as embodied in the newly revised Northwest Forests management plan and the new Elliott management plan will further increase the amount of take of marbled murrelets in these forests.

192.    The ten-year implementation plans approved for the Astoria, Forest Grove, Tillamook, and Coos districts are all contributing to the take of marbled murrelets by causing logging in these districts and thus, the incidents of take described in paragraphs 161 to 191. These plans also allow further timber sales along the lines of those described above in paragraphs 161 to 189 to occur, which cause take of marbled murrelets as previously described. These plans further authorize the logging of many millions of board feet of timber as described in paragraphs 114-116, 139, and 149 that by necessity will occur in proximity to designated Marbled Murrelet Management Areas and murrelet habitat.  This logging will increase the likelihood of nest predation and/or blow down of marbled murrelet habitat.

193.    The annual operations plans approved for the Astoria, Forest Grove, Tillamook, and Coos districts discussed in paragraphs 142 to 144 and paragraph 151 are all contributing to the take of marbled murrelets by contributing to the incidents of take described in paragraphs 161 to 189.

## CAUSE OF ACTION

### Take of Marbled Murrelets

194.    Plaintiffs hereby incorporate by reference the allegations in the foregoing paragraphs 1-193.

195.    Defendants are violating the prohibition against the "take" of species listed under the Endangered Species Act, 16 U.S.C. § 1538, by authorizing and proposing to authorize the

40

logging of timber sales on the Tillamook, Clatsop, and Elliott State Forest as described in paragraphs 161 to 193 above.  In sum, these actions are causing the unauthorized take of murrelets by:  (1) authorizing logging of habitat occupied by marbled murrelets; (2) planning timber sales and authorizing logging that fragments and reduces marbled murrelet occupied and suitable habitat and surrounds designated Marbled Murrelet Management Areas with clear cuts; and (3) creating Marbled Murrelet Management Areas of an insufficient size and/or shape to protect the birds while nesting and that contribute to the fragmentation of marbled murrelet habitat.  Defendants' unlawful actions injure plaintiffs in the manner described in paragraphs 18 to 35 above.

196.    Defendants are further violating the prohibition against the "take" of a threatened species as described in paragraphs 161 to 193 above by:  (1) following a "take avoidance policy" that is actually causing take (instead of obtaining a section 10 permit); (2) increasing logging on the Tillamook, Clatsop, and Elliott State Forests as required by the recently revised forest management plans; and (3) authorizing logging pursuant to implementation and annual operations plans.  Defendants' unlawful actions injure plaintiffs in the manner described in paragraphs 18 to 35 above.

WHEREFORE plaintiffs respectfully request that this Court enter an order:

1.    Declaring that defendants are unlawfully taking marbled murrelets in violation of the Endangered Species Act;

2.    Declaring that defendants are authorizing timber sales that are taking marbled murrelets by authorizing logging in occupied habitat, fragmenting and reducing marbled murrelet occupied and suitable habitat and surrounding designated Marbled Murrelet Management Areas with clear cuts, and creating Marbled Murrelet Management Areas of

41

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

an insufficient size and/or shape to protect the birds while nesting and that contribute to the fragmentation of marbled murrelet habitat;

2.      Declaring that defendants' management of, decision-making regarding, and timber sale programs for the Tillamook, Clatsop, and Elliott State Forests violate the Endangered Species Act and the implementing regulations for the Act;

4.      Enjoining defendants from continuing to violate the Endangered Species Act and that Act's implementing regulations with respect to future forest management, decision-making, and timber sale planning;

5.      Enjoining defendants from authorizing any activities that take marbled murrelets unless and until defendants apply for and obtain permission from the Fish and Wildlife Service to incidentally take marbled murrelets during management of the Tillamook, Clatsop, and Elliott State Forests pursuant to a section 10 permit;

6.      Awarding plaintiffs their attorneys' fees and costs incurred as a result of this matter; and

7.      Granting plaintiffs such other and further relief as may be just and proper.


                                        Respectfully submitted this 31st day of May, 2012,

                                        _____s/ Daniel R. Kruse_____
                                        DANIEL R. KRUSE (OSB No. 064023)
                                        dkruse@cldc.org
                                        Attorney at Law
                                        130 South Park Street
                                        Eugene, OR 97401
                                        (541) 870.0605
                                        (541) 484.4996 (Fax)
                                        Lead Counsel

                                        TANYA M. SANERIB (OSB No. 025526)
                                        tanya@crag.org

                                        42

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

CHRISTOPHER WINTER (OSB No. 984355)
chris@crag.org
Crag Law Center
917 SW Oak Street, Suite 417
Portland, OR 97205
(503) 525.2722 (Sanerib)
(503) 525.2725 (Winter)
(503) 296.5454 (Fax)

SCOTT JERGER (OSB No. 023377)
scott@fieldjerger.com
Field Jerger LLP
621 SW Morrison Street, Suite 1225
Portland, OR 97205
503-228-9115
503-225-0276 (Fax)

NICHOLAS CADY (OSB No. 113463)
nick@cascwild.org
Cascadia Wildlands
P.O. Box 10455
Eugene, OR 97440
(541) 434.1463

SUSAN JANE M. BROWN (OSB No. 054607)
brown@westernlaw.org
Western Environmental Law Center
4107 NE Couch St.
Portland, OR 97232
(503) 914.1323
(541) 485.2457 (Fax)

Attorneys for Plaintiffs

43